UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **EL JAY POULTRY CORPORATION, individually and on behalf of all those similarly situated,**<br><br>     **Plaintiff,**<br><br>  **v.**<br><br>**PACKAGING CORPORATION OF AMERICA; INTERNATIONAL PAPER; NORAMPAC INDUSTRIES INC.; CASCADES, INC.; DOMTAR CORPORATION; WEYERHAEUSER COMPANY; GEORGIA PACIFIC LLC; TEMPLE-INLAND INC.; and SMURFIT-STONE CONTAINER CORPORATION**<br><br>     **Defendants.** | Case No.<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATION OF THE SHERMAN ACT**<br><br>**JURY TRIAL DEMAND** |

   Plaintiff El Jay Poultry Corporation, individually and on behalf of a class of all those similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, and demands a trial by jury.

## <u>NATURE OF THE ACTION</u>

   1.  This case is an antitrust class action brought to recover for the injuries sustained by Plaintiff and the members of the class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. This action is brought on behalf of a Plaintiff Class, defined more fully below in Paragraph 29, consisting of all persons and entities that purchased Containerboard Products directly from Defendants between August 2005 and the present (the "Class Period") and seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure.

   2.  Containerboard, which includes both linerboard and corrugating medium, is the principal raw material used to manufacture corrugated products such as boxes and other types of

corrugated containers. Linerboard is used as the facings to which corrugating medium is fluted and laminated to produce sheets. The containerboard sheets are subsequently printed, cut, folded and glued to produce corrugated products. As used herein, "Containerboard Products" includes corrugated sheets and corrugated products including boxes and other containers. Defendants are integrated producers of the Containerboard Products sold to the Plaintiff Class.

3.    Various Containerboard Products manufacturers, including multiple Defendants herein and their predecessors, have been subject to governmental investigations and civil lawsuits concerning their engagement in anticompetitive conduct over the past two decades. The Containerboard Products industry is highly susceptible to collusive behavior and anticompetitive conduct due to a small number of manufacturers, inelastic product demand, the commodity-like nature of the products, and an inability of any single manufacturer to unilaterally control supply and price.

4.    The consolidation of the containerboard industry has served to further concentrate the industry and exacerbate the conditions that led to the anticompetitive conduct at issue in this complaint.

5.    Defendants' opportunities and ability to engage in anticompetitive practices are fostered through the frequent meetings and events held by industry trade organizations led by officers and/or board members who simultaneously serve as the Defendants' employees.

6.    Beginning in 2005, as the Containerboard Products industry was faced with decreasing profit margins, rising product demand, and a promising macroeconomic outlook, Defendants began a coordinated across-the-board imposition of capacity restraints, leading to a subsequent restriction in the supply of Containerboard Products on the market. The goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the Class Period. Defendants' conspiracy included a scheme to impose capacity constraints which had the effect of creating an artificial shortage of Containerboard Products in the United States during a time of stable or increasing demand, thereby allowing Defendants to charge supra-competitive prices to the Plaintiff Class. As detailed below, the conspiracy was effected, in part, by calls-to-arms and pledges by and between defendants that

were followed by actions that resulted in massive and unprecedented idling of production capacity, reduced production and near simultaneous across-the-board price increases.

7.     Defendants' anticompetitive conduct cannot be explained away as independent parallel behavior.  As multiple Defendants confirm in their own quarterly reports, market demand for Containerboard Products remained stable or was expected to increase during the period of coordinated production capacity restriction.  Similarly, no significant lasting changes in production costs account for the Defendants' repeated price increases.  In fact, during the Class Period, price increases outpaced cost increases by over fifty percent (50%).  Although basic economics holds that manufacturers in a competitive market faced with similar demand conditions as evidenced here would be expected to increase production to satisfy market demand and gain market share, each Defendant refrained.  In sum, Defendants' conduct, individually and collectively, evidences a restriction of freedom and sense of obligation associated with an agreement.

8.     The market impacts of Defendants' scheme on the Plaintiff Class have been, and continue to be, substantial.  As a result of Defendants' market domination and their coordinated restriction of production and operations capacity, direct purchasers of Containerboard Products were forced to pay substantially higher prices during the conspiracy period than they would have paid in a competitive market.

9.  Giving a voice to those impacted by Defendants' coordinated actions, on July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "*3rd Containerboard Increase puts the Integrity of Our Industry on the Line*."  The article notes that in light of the manufacturing capacity cuts, as well as the absence of cost drivers, yet another price increase, the third for 2010, beyond already historic highs "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies" and noted the similarity of the present situation to "the years 1994-1995, six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak" which resulted in allegations of collusion, government investigations and a consent decree and over $200 million paid in settlements.

3

## JURISDICTION AND VENUE

10.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and to enjoin further violations.

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

12.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

13.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## PARTIES

14.     Plaintiff El Jay Poultry Corporation ("Plaintiff") is a New Jersey corporation, with its principal place of business in Voorhees, New Jersey.  During the Class Period, Plaintiff, through its subsidiary Oak Valley Farms, Inc., purchased Containerboard Products directly from one or more of the Defendants.  El Jay Poultry Corp. owns all rights and claims of Oak Valley Farms, Inc. in this matter..

15.     Defendant Packaging Corporation of America ("PCA") is a Delaware corporation with its principal place of business at Lake Forest, Illinois.  During the Class Period, PCA and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

16.     Defendant International Paper ("International Paper") is a New York corporation with its principal place of business at Memphis, Tennessee.   During the Class Period,

International Paper and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

17.     Defendant Norampac Inc. ("Norampac") is a Canadian corporation with its principal place of business at Quebec, Canada.  Norampac was formed in 1997 as a joint venture by Cascades Inc. and Domtar Corporation and became a wholly-owned and controlled subsidiary division of Cascades Inc. in December 2006.  During the Class Period, Norampac and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

18.     Defendant Cascades Inc. ("Cascades") is a Canadian corporation with its principal place of business at Quebec, Canada.  During the Class Period, Cascades and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including, but not limited to Defendant Norampac, sold Containerboard Products in interstate commerce directly to purchasers in the United States.

19.     Defendant Domtar Corporation ("Domtar") is a Canadian corporation with its principal place of business at Quebec, Canada.  During the Class Period, Domtar and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including, but not limited to Defendant Norampac, sold Containerboard Products in interstate commerce directly to purchasers in the United States.

20.     Defendants Norampac, Cascades, and Domtar are sometimes referred to collectively herein as "Norampac." Norampac's subsidiaries and divisions in Canada serviced customers in the United States by selling Containerboard Products directly to them as alleged above. Norampac's subsidiaries and divisions located in the United States including Norampac Industries, Inc. Lancaster Division in Lancaster, New York (corrugated packaging containers) and Niagara Falls Division in Niagara Falls, New York (corrugated medium); Norampac New England, Inc., Thompson Division in Thompson, Connecticut (corrugated packaging containers) and Leominster Division in Leominster, Massachusetts (corrugated products) Norampac New York City Inc., Maspeth, New York (corrugated products) and Norampac Schenectady Inc.

(corrugated packaging) also sold Containerboard Products in interstate commerce directly to purchasers in the United States.

21. Defendant Weyerhaeuser Company ("Weyerhaeuser") is a Washington corporation with its principal place of business at Federal Way, Washington. During the Class Period, Weyerhaeuser and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

22. Defendant Georgia Pacific LLC ("Georgia Pacific") is a Georgia corporation with its principal place of business at Atlanta, Georgia. During the Class Period, Georgia Pacific and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

23. Defendant Temple-Inland, Inc. ("Temple-Inland") is a Delaware corporation with its principal place of business at Austin, Texas. During the Class Period, Temple-Inland and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

24. Defendant Smurfit-Stone Container Corporation ("Smurfit-Stone") is a Delaware corporation with its principal place of business at Chicago, Illinois. During the Class Period, Smurfit-Stone and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States. On or about January 26, 2009, Smurfit-Stone filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware; effective June 30, 2010, Smurfit-Stone was discharged from the United States Bankruptcy Court for the District of Delaware under a plan of reorganization.

25. "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Containerboard Products manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold Containerboard

Products in interstate commerce directly to purchasers in the United States during the Class Period.

## CO-CONSPIRATORS

26.     Various other persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

27.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

28.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

> All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as August 2005 until the Present.

> Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

30.     Class Identity: The Class is readily identifiable and is one for which records should exist.

31.     Numerosity:  Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands of Class members as above described, the exact number and their identities being known to Defendants and their Co-conspirators.

32.     Typicality:  Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Containerboard Products directly from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

33.     Common Questions Predominate:  There are questions of law and fact common to the Class, including, but not limited to:

    a.  Whether Defendants and their Co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Containerboard Products sold in interstate commerce in the United States;

    b.  The identity of the participants of the alleged conspiracy;

    c.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their Co-conspirators in furtherance of the conspiracy

    d.  Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

    e.  Whether the conduct of Defendants and their Co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

    f.  The effect of Defendants' alleged conspiracy on the prices of Containerboard Products sold in the United States during the Class Period; and

    g.  The appropriate class-wide measure of damages.

34.     These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

35.     Adequacy:  Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of

the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

36.     Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical.  Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## TRADE AND COMMERCE

### Containerboard Products

37.     Containerboard is the principal raw material used to manufacture corrugated products. Containerboard includes both corrugating medium and linerboard.  Linerboard is a flat wood-fiber paperboard.  Corrugated medium is a type of fluted paperboard made from the same material as linerboard.  Linerboard is used as the inner and outer facings, or liners, of corrugated products. Corrugating medium is fluted and laminated to linerboard in corrugator plants to produce corrugated sheets. The sheets are subsequently printed, cut, folded and glued to produce corrugated products, mostly boxes and other containers.  As used herein, "Containerboard Products" includes corrugated sheets and corrugated products including corrugated boxes and other corrugated containers.

38.     Defendants and their co-conspirators manufacture and sell linerboard, corrugated medium, containerboard and corrugated boxes and other corrugated containers.

39.     Containerboard Products are a multi-billion dollar industry.  During the relevant time period, annual sales of Containerboard Products were tens of billions of dollars.

40.     The containerboard industry is heavily concentrated.  As of 2010, Defendants had an approximate combined 83% share of the containerboard market, controlling nearly thirty million tons of annual production.  Collectively, Defendants and their co-conspirators control an even greater proportion of the supply of Containerboard Products in the market.

41.     The price of corrugated medium is tied to the price of linerboard.  As a result, the price of containerboard is directly tied to the price of corrugated medium and linerboard.  Likewise, because containerboard is used in the manufacture of corrugated containers, a rise in the price of containerboard results in a similar rise in the price of corrugated containers.  Collectively, Defendants and their co-conspirators utilize most of the linerboard and medium they manufacture to produce containerboard and corrugated containers that they sell to the Plaintiff Class.  In some instances, Defendants sell the manufactured linerboard and corrugated medium to other Defendants or independent converters who in turn produce containerboard sheets and corrugated products.  Corrugated products are generally viewed as interchangeable commodities because most manufacturers are able to supply the product needs of most customers.

### The Structure of the Containerboard Products Industry

42.     Economists Haizheng Li and Jifeng Luo (hereinafter "Li and Luo") of the Georgia Institute of Technology have thoroughly examined the containerboard industry and concluded that the characteristics of the containerboard industry make it highly susceptible to horizontal price-fixing and output restrictions:

> The linerboard industry is very capital intensive and thus entry is restricted because of the large amount of capital and the long-term nature of investment…Firms may have similar cost curves if the equipment used is similar.  Additionally, the demand for containerboard is relatively inelastic because of no major substitutes.  Therefore, the US linerboard industry may have a certain degree of oligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.[1]

---

[1] Li, Haizheng and Jifeng Luo. *Industry consolidation and price in the US linerboard industry*.  Journal of Forest Economics 14 (2008) at 98.

43.     Antitrust law and economics have identified several factors which make markets susceptible to price-fixing. Those factors include: relatively few firms with a large share of the market; high barriers to entry into the market; lack of close substitutes/commodity nature of the good; inelastic demand; and inability of any single firm to control supply and price unilaterally. The Containerboard Products industry demonstrates all of these factors.

44.     <u>Relatively Few Firms</u>: Historically, Containerboard Products has been considered a concentrated industry. In the last decade, however, a series of mergers and acquisitions have led to a significant increase in market concentration. In 1995, the top five firms controlled approximately 42% of the containerboard market and the top 10 firms had a combined 66% market share. During the relevant time period of this complaint, the containerboard industry endured considerable consolidation resulting in the top five firms controlling approximately 72.5%, of the containerboard market while the Defendants' combined share reached approximately 83%.

45.     The consolidation of the Containerboard Products industry involving Defendants and their co-conspirators both during the Class Period and immediately preceding it has been substantial. The following are examples of transactions that lead to such concentration:

- In February 2004, PCA purchased Acorn Corrugated Box Co.;
- In March 2004, Georgia-Pacific bought the assets of Temple-Inland's corrugated box plants;
- In April 2004, International Paper acquired Box U.S.A.;
- In April 2005, PCA acquired Midland Container Corp.;
- In September 2005, the Jefferson Smurfit Group merged with Kappa Packaging;
- In October 2005, Norampac acquired three Standard Paper Box plants;
- In April 2006, Georgia-Pacific acquired Smurfit-Stone's Brewton, Alabama, linerboard mill;
- In July 2007, International Paper purchased the remaining shares of Compagnie Morocaine des Cartons et des Papiers (CMCP); and

- In March 2008, International Paper acquired Weyerhaeuser's Packaging Business;

- In April 2008, Smurfit-Stone acquired Calpine Corrugated LLC.

46. <u>Barriers to Entry</u>: The Containerboard Products industry reflects two significant barriers to entry: 1) capital-intensive start-up costs; and 2) high transportation costs. The equipment used to manufacture Containerboard Products is both highly specialized and very expensive. Li and Luo conclude that the "linerboard industry is very capital intensive…entry is restricted because of the large amount of capital and the long-term nature of investment." Another industry report affirmed that "The industry is capital-intensive."[2] Consequently, large capital investments prohibit new entrants. At a 2005 industry trade conference attended by Defendants' officers, employees or representatives, presenter Deloitte Development LLC instructed the audience not to overestimate "the threat of new entrants into the market," indicating that entry into the containerboard market was highly unlikely.[3]

47. <u>Manufacturers Have Similar Costs</u>: Defendants and their co-conspirators, share relatively similar costs. The technology and process of containerboard manufacturing are well-known and Defendants and their co-conspirators employ the same types of equipment and processes in the production process.

48. Moreover, the fewer the number of firms in an industry, the more similar costs become for the remaining firms. Accordingly, the recent consolidation of the Containerboard Products industry has in turn driven Defendants' costs to be even more similar. Further, paper manufacturing has relatively few economies of scale. Industry reports state that "Large and small producers operate the same kinds of plants –large producers just have more of them."[4] The combination of these industry facts – consolidation, similar plants, and technology – indicates that the Defendants have very similar cost structures.

49. Because Containerboard Products are bulky and cumbersome to transport, long-distance shipping is expensive. Consequently, there are geographic entry barriers to the

---

[2] Hoover's Industry Profile: Paper Products Manufacture.
[3] Sinoway, Mike, Pricing Opportunities in the Forest Products Industry, June 28, 2005, Deloitte Development LLC.
[4] See PCA Form 10-K, filed February 20, 2008 at p.11.

Containerboard Products industry as well. One industry report stated that "[t]he effective sales area for corrugated boxes, for example, is only about 150 miles from the production plant."[5] High start-up costs and shipping costs make entry into the containerboard market very difficult.

50.    No Close Substitutes/Commodity Nature of the Products:    Containerboard Products do not have close substitutes in the market. The closest substitutes for corrugated containers are plastic containers, which comprise a very small portion of the container or packaging market. Likewise, containerboard and corrugated packaging are commodities because containerboard and corrugated containers made by any one of the Defendants is interchangeable with that of any of the other Defendants. In its 2007 10-K filing, PCA acknowledged this fact, noting "[c]ontainerboard is generally considered a commodity-type product and can be purchased from numerous suppliers."[6]

51.    Inelastic Demand:    The demand for Containerboard Products is very inelastic. Li and Luo estimated the price elasticity of demand for linerboard to be 0.18. This means that a one percent increase in linerboard price would result in just a 0.18% decrease in the quantity demanded. When elasticity is this low, concerted price increases are likely to be profitable and sustainable since purchasers will continue to purchase nearly the same quantity of containerboard despite price increases.[7]

52.    Market Power:    While the Defendants and their co-conspirators comprise 83% of the containerboard market, no single firm has sufficient market power to unilaterally control supply and price. For example, PCA's 10-K for the year ending December 31, 2006, states that "PKG [stock symbol for PCA] operates in an industry that is highly competitive, with no single containerboard or corrugated packaging producer having a dominant position." Similarly, Temple-Inland's 10-K for the year ending December 31, 2006, states "[g]iven the commodity nature of our manufactured products, we have little control over market pricing or market demand. No single company is dominant in any of our industries."[8]    As a result, when single

---

[5] Hoover's Industry Profile: Paper Products Manufacture; see also, PCA Form 10-K, filed February 20, 2008 at p. 11, noting, "[c]orrugated producers generally sell within a 150-mile radius of their plants."
[6] See PCA Form 10-K, filed February 20, 2008 at p. 11.
[7] See N. Gregory Mankiw, PRINCIPLES OF ECONOMICS (5th ed. 2009), at p. 94.
[8] See Temple-Inland Form 10-K, filed February 23, 2007 at p. 10.

manufacturers have attempted to raise prices without the agreement of other firms, customers are able to resist the unilateral price increase by turning to other manufacturers.

### Industry and Trade Association Membership

53.     The Fibre Box Association ("FBA") is a Containerboard Products trade organization. Its members include Defendants PCA, International Paper, Norampac, Georgia-Pacific, Temple-Inland and Smurfit Stone. According to its 2007 tax records, Thomas A. Hassfurther, PCA's current Executive Vice President, served as FBA's 1st Vice Chairman, and its board of directors includes representatives from Temple-Inland, Georgia-Pacific, International Paper, Weyerhaeuser, and Smurfit-Stone. The FBA holds at least three meetings each year where executives and other representatives of the Defendants and their co-conspirators have an opportunity to meet and talk with one another, including communicating about supply and prices. Further, the FBA holds dozens of networking events each year which give the Defendants and their co-conspirators additional opportunities to communicate with one another. Further, the FBA publishes a set of antitrust guidelines that it distributes to its members. Notably absent from these guidelines are prohibitions on communicating or agreeing with other containerboard product manufacturers concerning output, supply or capacity decisions.

54.     The American Forest & Paper Association ("AF&PA") is a trade organization representing forest and building product industries as well as pulp, paper and paperboard manufacturers. Its members include PCA, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland and Smurfit-Stone. During the Class Period, its officers have included James Hannan, President and CEO of Georgia-Pacific and John Faraci, Chairman and CEO of International Paper and its board of directors has included Daniel S. Fulton, President & CEO of Weyerhaeuser, Patrick J. Moore, Chairman & CEO of Smurfit-Stone, Doyle R. Simons, Chairman & CEO of Temple-Inland, and Paul T. Stecko, Chairman & CEO of PCA. The AF&PA holds several meetings a year where executives and other representatives of the Defendants have an opportunity to meet and talk with one another, including communicating about supply and prices. As described below, AF&PA forums have included instructions on steps to conceal anticompetitive communications between firms.

14

### History of Anticompetitive Conduct

55.     For decades, the paper and pulp industry has consistently demonstrated cartelization and anticompetitive behavior.   In particular, the linerboard, corrugated, containerboard and Containerboard Products segments of the industry have a history of antitrust violations dating back to a consent decree entered on April 23, 1940 in the action entitled *United States of America, Plaintiff, against National Container Association, et al., Defendants* (SDNY Civil Action No. 8-318) and *United States v. Container Corporation of America, et al.*, 393 US 333 (1969) whereby the defendants (including certain predecessors of Defendants herein) were found to have violated Section 1 of the Sherman Act after being charged with conspiring to restrain price competition in sale of corrugated containers in the Southeastern United States from January 1, 1955, to October 14, 1963.[9]  The Defendants and their co-conspirators have a prior history of anticompetitive horizontal agreements with one another.

56.     Many of the same firms involved in the cartel alleged in this Complaint, including PCA, International Paper, Smurfit-Stone (then known as Stone Container Corp.) and Georgia-Pacific were also involved in a price fixing cartel over corrugated containers and corrugated cardboard sheets from 1964-1975.  Those firms that did not settle went to trial and most settled before a verdict was rendered; the sole Defendant remaining at the time of the verdict was found liable for participating in a price fixing conspiracy over corrugated containers and corrugated sheets from 1964-1975.  See *In re Corrugated Container Antitrust Litigation*, 556 F.Supp. 1117, 1125 (D.C.Tex.1982).

57.     In 1998, Stone Container Corp. (now known as Smurfit-Stone) entered into a consent agreement with the Federal Trade Commission ("FTC") in which it pledged to refrain from "entering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any

---

[9] See *U.S. v. Container Corp. of America*, 273 F.Supp. 18, (M.D.N.C. Aug 31, 1967)  and  *U.S. v. Container Corp. of America*, 1970 WL 513, 1970 Trade Cases P 73,217 (M.D.N.C. May 19, 1970)  (on remand).

other pricing action with regard to sales of linerboard to third parties." See *In the Matter of Stone Container Corp.*, Docket No. C-8306, Decision and Order, May 18, 1998.

58.     Smurfit-Stone, International Paper, Georgia Pacific, Weyerhaeuser, Temple-Inland, and PCA were involved in a price-fixing cartel over containerboard from 1993-1995. See *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002).   As part of the conspiracy, these firms increased the "downtime" of linerboard machines, reducing production and inventory. At the same time, they purchased substantial amounts of containerboard from one another, protecting market shares, causing an artificial shortage and an increase in the price of linerboard. At the peak of the cartel's efficacy in 1995, the price of linerboard peaked at $530/ton.  The class action claims were settled in 2003 when the defendants agreed to pay their customers over $200 million, however lawsuits brought by Plaintiffs opting out of the class proceeded.

59.     As a result of their exposure to prior antitrust lawsuits, Defendants have taken steps to conceal their anticompetitive communications with one another.  For example, at the American Forest & Paper Association's 128th Annual Paper Week held in New York City in April 2005, Defendants attended a seminar entitled "Are You Vulnerable to Lawsuits?" aimed at reducing vulnerability to antitrust litigation.[10]  Because the Defendants have received training on how to avoid getting caught communicating with one another regarding price and output decisions, the amount of conspiratorial evidence that can be obtained from public sources and without access to internal records and testimony is highly limited.  Nevertheless, the existence of an agreement is unambiguously evidenced through their coordinated conduct during the Class Period.

## VIOLATIONS ALLEGED

60.     The unprecedented industry consolidation detailed in paragraphs 44 and 45 created an environment conducive to collusion.  Further, at or about the onset of the Class Period, the Containerboard Products industry was experiencing decreased profit margins, rising product demand, and a promising economic outlook.  Additionally, shortly before the Class

---

[10] *Are You Vulnerable to Lawsuits?* OFFICIAL BOARD MARKETS, (April 23, 2005).

Period, the Containerboard Products industry endured two failed price increases. Specifically, on May 31, 2003, Official Board Markets reported that a $35/ton price increase in both linerboard and medium failed, noting "[n]ot only is this attempt a failure, but discounting prevails." While prices steadily increased in 2004, by early 2005 they again began to recede, bottoming out in spring 2005. On May 31, 2005, Official Board Markets reported that Defendant International Paper announced a $50/ton price increase but due to International Paper's competitors not backing the price increase with a "firm stance," the end result was a failed increase. In June 2005, "it became apparent that industry-wide price hikes weren't sticking. Instead of rising about 10%, prices on the thick paper used to make corrugated containers slipped as inventories of boxes inched higher."[11] These factors acted together as the catalyst for Defendants to coordinate their capacity restraints in order to reduce available supplies and thereby fix, raise, stabilize and maintain the prices of Containerboard Products.

61.     In October 2003, Smurfit-Stone announced a massive restructuring plan intended "to reduce [containerboard] capacity."[12] According to its Chief Executive Officer Pat Moore, the designed goal was "to cut supply enough at Smurfit [-Stone] to force price increases throughout the industry."[13] After the failed May 2005 price increase, Smurfit-Stone recognized that their independent action to reduce containerboard capacity could not force industry prices upward unless Defendants supported both the capacity reduction and subsequent price increases.

62.     The period of 2005-2010 witnessed an exceptional number of containerboard plant closings, capacity reductions, and price increases that can only be explained by concerted effort by the Defendants and their co-conspirators. Defendants increased Containerboard Products prices increased eight times between August 2005 and August 2010. Over that period, Containerboard Product prices have increased over fifty percent (50%) despite the economic downturn during the latter half of the Class Period. Each of these price increases was implemented by the Defendants nearly simultaneously and was facilitated by reductions in

---

[11] *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05*, Crain's Chicago Bus., June 27, 2005, at p. 4.
[12] *Clayton, Mo., Packaging Firm Smurfit-Stone Container Thinks Outside the Box,* St. Louis Dispatch, Aug. 22, 2004, at p. 1.
[13] *Id.*

supply and production capacity. In the face of increasing demand, these reductions make no economic sense absent conspiracy and collusion. Norampac's 2005 20-F filing illustrates these phenomena:

> In 2005, industry box shipments decreased by 0.4% in North America while North American containerboard operating rates were approximately 95%. Containerboard producers in the United States reduced their inventories and drove a US$30/ton increase on linerboard in October following a US$55/ton decrease in the first three quarters of the year.

63.     Demand for Containerboard Products is tied to overall consumer demand and spending. In mid-2005 and continuing thereafter through 2007 consumer demand, including demand for Containerboard Products in the U.S. was relatively stable and industry expectation were that demand would increase, yet defendants cut capacity and raised prices. These actions were contrary to Defendants' unilateral economic interests because, given market conditions and expectations that demand was increasing, in a competitive market capacity would, at minimum, be maintained if not expanded, in order to enhance volumes, revenues, profits and market share. In 2008, consumer demand in the United States plummeted, yet defendants continued to raise prices; in August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%; and notwithstanding fears of deflation in the general economy, increased prices an unprecedented three times in 2010 to all-time highs, without any underlying cost justifications, leading one market commentator to note that the historic price increases "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies" and to note the similarity of the present conduct of Defendants to the conduct in the prior *Linerboard* cases.

64.     Defendants and their co-conspirators were also able to facilitate the conspiracy in part by causing artificially inflated, supra-competitive prices to be published in trade publications which served to indicate and index prices or to function as list prices for Containerboard Product purchasers. Certain supply and purchase contracts between Defendants and purchasers were tied to the prices listed in those trade publications.

65.     Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply. As a result of Defendants' conduct as alleged herein, their production capacity of Containerboard Products was significantly reduced while their prices increased by approximately 50% between 2005 and 2010:





**2005**

66.     In the 1st Quarter of 2005, Defendant Smurfit-Stone closed its 203,000 tons-per-year Fernandina Beach, Florida, containerboard plant.  Notwithstanding the closure of this plant, on May 5, 2005, Smurfit Stone reported in its SEC Form 10-Q filing that "[w]e expect our profitability to improve in the 2nd Quarter of 2005 as a result of stronger demand and high sales prices for containerboard and corrugated containers."

67.     During the 1st Quarter of 2005, Defendant PCA idled 65,000 tons per year of production capacity by taking off-line one of its three paper machines at its containerboard plant in Tomahawk, Wisconsin.

68.     Defendant Weyerhaeuser likewise reported strong demand for Containerboard Products during the 1st Quarter of 2005 in its 3rd Quarter 2005 Form 10-Q, stating that:

> Containerboard sales increased $36 million. Unit shipments increased 45,000 tons, or approximately 18 percent, and price realizations, which include freight and are net of normal sales deductions, increased $71 per ton, or approximately 22 percent in the first quarter of 2005, compared to the same period of 2004. These increases were mainly due to an improvement in demand for corrugated packaging in U.S. markets.

69.     Similarly, International Paper reported in its May 6, 2005 Form 10-Q that "2nd Quarter earnings normally benefit from seasonably higher containerboard and box demand."

70.     Nevertheless, in the 2nd Quarter of 2005, International Paper took approximately 530,000 tons of containerboard downtime compared with approximately 215,000 of downtime in the 2nd Quarter of 2004.  In its 10-Q filed on August 5, 2005, Defendant explained that this was "market related downtime" which was "taken to balance internal supply with demand to help manage inventory levels."  However, when a manufacturing plant is idled during "downtime", the firm must continue to pay fixed costs, which are very high in the Containerboard Products industry.  Smurfit-Stone acknowledged this fact in its SEC Form 10-K for the 2006 fiscal year, stating: "the industry is capital intensive, which leads to high fixed costs and has historically resulted in continued production as long as prices are sufficient to cover marginal costs." Accordingly, "market related downtime" is very costly and is economically irrational from a single-firm's point of view during periods of strong demand, such as the 2nd Quarter of 2005.

71.     As previously alleged, at the onset of the Class Period, Defendants were experiencing decreased profit margins and historically high demand.  In that context, in June 2005, employees and representatives from each of the Defendants and their co-conspirators, including Pete Correll, Chairman and CEO of Georgia-Pacific, David A. Spraley. Vice President of Georgia-Pacific, C. Richard Larrick, General Manager of Georgia-Pacific, Russell Bishop, Chief Information Officer of Weyerhaeuser, Dick Thomas, Vice President of Weyerhaeuser, Ronnie Cosper, Papermill Superintendent for Smurfit-Stone, and others were reported as attending the PIMA 2005 Leadership Conference in Nashville, Tennessee.[14]  The theme of this conference was "Success through Collaborative Teamwork."  Topics discussed included "Effective Collaboration through Teamwork" and "Price Execution in the Forest Products Industry."

72.     During this conference, Deloitte Consulting LLP gave a presentation called "Pricing Opportunities in the Forest Products Industry."  Deloitte began its presentation by stating that the industry was "rich in competitive intelligence, which facilitates strategic pricing analysis."  The presentation also included a discussion regarding the several factors which made coordinated price increases possible such as "underestimating competitor's desire to raise prices" and "overestimating the threat of new entrants into the market."[15]

73.     Immediately before this conference, on June 27, 2005, Smurfit-Stone reported that it "has no immediate plans to close down plants."[16]  But only days later, on July 1, 2005, Deutsche Bank, which monitors the containerboard industry and issues regular reports on developments within the industry, reported that "[t]here has been a lot of 'chatter' suggesting that one or more of the big integrated producers will soon shutter capacity."[17]

---

[14] The Paper Industry Management Association, or "PIMA," describes itself as "the premier association for management professionals in the paper and pulp industry" with the goal of contributing "to the strength of the international pulp and paper community by providing the means for our members to address relevant industry issues and to develop their management and leadership skills."

[15] Sinoway, Mike, Pricing Opportunities in the Forest Products Industry, June 28, 2005, Deloitte Development LLC.

[16] Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05, Crain's Chicago Bus., June 27, 2005, at p. 4.

[17] *050701 Containerboard & Boxes -- Boxed in*, Deutsche Bank – Equity Research

74.     On July 19, 2005, Deutsche Bank reported "IP [International Paper] capacity withdrawals will help uncoated and CB [containerboard] producers.  Among the names: DTC [Domtar], PKG [Packaging Corporation of America], TIN [Temple-Inland]."[18]

75.     Beginning in early 2005, and continuing throughout the remainder of the year, Defendant Temple-Inland closed containerboard converting facilities in Antioch, California, Newark, Delaware, Atlanta, Georgia, and Louisville, Kentucky.  This reduced the supply of corrugated containers and aided in the overall scheme to increase the price of Containerboard Products.  Temple-Inland closed these facilities despite acknowledging in its May 10, 2005 10-Q that "market demand strengthened, resulting in higher prices for most of our product offerings."  The closures were against Temple-Inland's unilateral economic self-interest because they were made during a period of increasing demand and prices.

76.     In the 3rd Quarter of 2005, Smurfit-Stone permanently closed two more of its containerboard mills as part of what the company called "its ongoing assessment and restructuring efforts."  Smurfit-Stone closed mills in New Richmond, Quebec and Bathurst, New Brunswick.  It closed these mills despite acknowledging in its 10-Q, filed with the SEC on August 8, 2005, that "In the third quarter of 2005, we expect seasonably strong demand for containerboard and corrugated containers."  All together, these mills accounted for approximately 274,000 tons per year of containerboard.  According to its 2007 Annual Report, in 2005 Smurfit Stone shut down 8.5% of its total capacity. The closures were against Smurfit-Stone's unilateral economic self-interest because they were made during a period of increasing demand and prices.

77.     On August 4, 2005 Deutsche Bank reported:

Smurfit-Stone today announced a number of permanent capacity closures...a bit more capacity than we expected, a bit earlier than we expected.  They amount to 480K tons...or about 1.3% NA capacity...With Smurfit having done a good deal of "heavy lifting", we'll be watching the behavior of other major competitors like International Paper and Weyerhaeuser...the outlook of demand has also improved remarkably in recent weeks.[19]

---

[18] *050719 IP Thoughts on Restructuring,* Deutsche Bank – Equity Research
[19] *050804 Bigger - Sooner - Enough -- Smurfit Announces Mill Shuts,* Deutsche Bank – Equity Research

78.     The following day, the St. Louis Post-Dispatch reported that Smurfit-Stone stated that "the closures are part of its restructuring efforts and will reduce its container-board manufacturing capacity by about 700,000 tons."[20]   Approximately one month later, on September 7, 2005, Smurfit-Stone announced a price increase of $30/ton to take effect on October 1, 2005.  On September 17, 2005, Defendant PCA followed with the announcement of a $30 per ton price increase also effective October 1, 2005.

79.     During the second quarter of 2005, Georgia-Pacific reduced the number of its containerboard shipments "due to slowback and maintenance downtime."[21]   A slowback is another form of output restriction in lieu of completely shutting a machine or mill down. Georgia-Pacific did both in 2005, scheduling all major maintenance downtime across its mills in the fourth quarter of 2005 while announcing price increases of $30 per ton on linerboard medium, and 8% on boxes to be effective during that quarter.[22]

80.     In the 3rd Quarter of 2005, International Paper also announced the closing of its 100,000 ton-per-year mill in Fort Madison, Iowa.

81.     On September 20, 2005, Deutsche Bank reported that containerboard prices were moving up but that "[w]hether prices can rise further without more supply reductions remains an open question."[23]

82.     That same month, September 2005, Defendant Norampac permanently closed one of its two 150,000 tons-per-year paper machines at its Red Rock, Ontario containerboard mill. Additionally, in 2005, Norampac took "market related downtime" equal to 6.7% of its North American capacity despite increasing prices and demand.

83.     In October 2005, Norampac CEO Marc-Andre Depin commented on the September 2005 machine shut down by noting "[i]f everyone would remove the same amount of capacity percentage-wise as we have, I think our business would look a lot better.  You have to be ready to let go of business if you want to keep the price up."[24]   In its 2005 Form 20-F,

---

[20] *Smurfit-Stone plans to close plants, lay off 565*, St. Louis Post-Dispatch, August 5, 2005, p. C3.

[21] *Georgia-Pacific Reports Second quarter Results,* Canada NewsWire, July 28, 2005, at p. 4.

[22] *Q3 2005 Georgia-Pacific Earnings Conference Call – Final,* FD (Fair Disclosure) Wire, Oct. 27, 2005, at p. 6.

[23] *051017 Deutsche Bank - September Containerboard Monitor,* Deutsche Bank – Equity Research

[24] Arzoumanian, M. *Board Increase Flies Through*, Official Board Markets, Volume 81, Issue 44, Oct. 29, 2005.

Norampac also noted, "continued industry consolidation, rationalization of inefficient containerboard mill capacity and market-related downtime have helped to better balance supply with demand and create a less volatile pricing environment."[25]

84.     On September 27, 2005, members of the FBA again met in Atlanta, Georgia at Georgia-Pacific's offices for the Corrugated Packaging Alliance Meeting.[26]  Just days later, on October 1, 2005, Defendants and their co-conspirators raised prices on linerboard by 7% ($30/ton) from $450/ton to $480/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 7% ($30/ton) from $420/ton to $450/ton.  Notably, the effective date of the price increase, as well as the amount of price increase, was implemented uniformly throughout the industry and mirrored the increase announced by Smurfit-Stone and PCA just weeks prior.   On October 3, 2005, Deutsche Bank reported that all major containerboard producers were now supporting the price increase.[27]

85.     Just one month later, on October 27, 2005, Deutsche Bank reported on another expected price increase: "Chemical producers do it, metal producers do it…maybe CB producers can do it too.  Two CB price hikes in 60 days is quite unusual.  A December price hike is unprecedented."[28]  Defendants were able to accomplish the across-the-board price increases by sharing supply and capacity curtailment information with one another in order to coordinate supply restrictions substantial enough to force and sustain a Containerboard Products price increase.

86.     On November 16, 2005, there was a meeting of the FBA's Board of Directors. That same day, Deutsche Bank reported that containerboard "[i]nventory numbers dropped steeply in October, much more than typical…inventories down to 2.18 million tons, lowest level since 1994."[29]  Notably, the last time that containerboard inventories were reported to be this low

---

[25] See Norampac Form 20-F for year ending December 31, 2005 at p. 16.
[26] The Corrugated Packaging Alliance, or "CPA," states its mission is in part "to provide a coordinated industry forum that effectively acts on competing materials matters that could not be accomplished by individual members."
[27] *051003 Dr Paper's Pulse on Pricing,* Deutsche Bank – Equity Research
[28] *051027 Deutsche Bank - Smurfit-Stone Container,* Deutsche Bank – Equity Research
[29] *051116 Deutsche Bank - October Containerboard Monitor and Numbers,* Deutsche Bank – Equity Research

was during a horizontal output restriction conspiracy that ran from 1993-1995. See *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir.2002).

87.     Less than two weeks after the meeting of the FBA's Board of Directors, on or about November 28, 2005, Weyerhaeuser and PCA announced a 40$/ton price hike, effective January 1, 2006. Regarding these announced price hikes, on November 28, 2005 Deutsche Bank reported that they "are likely to be joined by others before long."[30]

88.     On November 28, 2005, Deutsche Bank also reported that:

Industry sources report that 2 of North America's 6 largest containerboard producers (Weyerhaeuser, PCA) are talking with customers about a price hike on January 1. It would appear that the increases are in the $40/ton range...Because January and early February tends to be one of the slowest periods of the year, a January price hike is unusual...Box plant inventories fell 208K in October and have fallen 356K in 2 months. Measured in terms of days of supply, box plant inventories are at only 2.8 weeks - the lowest level we can find in our 20+yrs of data...Further supply reductions could heat the market even further over the next month or two.[31]

89.     The following day, Weyerhaeuser announced its intent to indefinitely idle its 350,000 tons-per-year linerboard machine in Plymouth, North Carolina. On November 29, 2005, Deutsche Bank reported that "[t]he shutdown removes nearly 1% of US containerboard capacity at a point when the market has begun to tighten rapidly. Containerboard was already a tight market."[32]

90.     On December 3, 2005, Official Board Markets reported that Weyerhaeuser was informing its customers about the $40 price increase and that "Packaging Corp. of America, Smurfit Stone Container Corp. and Temple-Inland are telling their customers the same thing."

91.     In total, Defendants and their co-conspirators shut down nearly 1 million tons of containerboard capacity in 2005, or over 3% of total market capacity. Their conduct cannot be reconciled with the strong demand the industry anticipated throughout 2005. Defendants and their co-conspirators did not have economic justification to unilaterally cull capacity or reduce production of corrugated containers. As demand and prices were increasing, independent firms

---

[30] *051128 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[31] *051128 Deutsche Bank - Paper and Packaging*, Deutsche Bank – Equity Research
[32] *051129 Deutsche Bank – Weyerhaeuser*, Deutsche Bank – Equity Research

acting in their unilateral self-interest had an incentive to refrain from reducing capacity in order to produce sufficient containerboard to meet the strong demand for corrugated containers, not to restrain output as they did.

## 2006

92.     The Defendants and their co-conspirators also anticipated strong demand for Containerboard Products in 2006.  For example, in its 10-K for the year ending December 31, 2005, International Paper reported that "[w]e see favorable signs of positive momentum for the remainder of 2006.  We anticipate that demand in North America for both uncoated paper and industrial packaging products will be stronger."

93.     Effective on or about January 1, 2006, Defendants and their co-conspirators again raised prices on linerboard by 8% ($40/ton) from $480/ton to $520/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 9% ($40/ton) from $450/ton to $490/ton.  These price increases, deemed "unusual" by Deutsche Bank just weeks before (see ¶ 88, *supra*), occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time.  In 2007, PCA Chairman and CEO, Paul Stecko, commented on the January 2006 price hike, noting "since consolidation began, inventories have trended down and we did get a price increase last January.  So that would historically not be a normal time."[33]

94.     That same month, in January 2006, the Corrugated Packaging Alliance Action Team met at Georgia-Pacific's headquarters in Atlanta, Georgia.  Despite the record low containerboard and corrugated container inventories and rising containerboard product prices, over the course of the following year, Defendants and co-conspirators continued to reduce capacity of Containerboard Products.  In its Form 20-F for fiscal year ending December 31, 2005, Norampac noted, "[i]n the first quarter of 2006, the situation was positive.  In particular, several North American producers announced capacity reductions or closures and some of them have also reduced their box making capacity."

---

[33] Transcript of Q1 2007 PCA Earnings Conference Call (April 18, 2007) at p. 6.

95.     In the 1st Quarter of 2006, Weyerhaeuser closed its 350,000 tons-per-year Plymouth, North Carolina containerboard plant.  This plant shutdown was not in Weyerhaeuser's economic self-interest as it came at a time of rising prices and record low inventories, as evidenced by its 2006 1st Quarter 10-Q wherein Weyerhaeuser reported that:

> The company anticipates improvement in earnings for the Containerboard, Packaging and Recycling segment in the second quarter primarily due to implementation of previously announced price increases for both containerboard and corrugated packaging and a seasonal increase in demand for corrugated packaging.

96.     On February 13, 2006, Deutsche Bank reported that containerboard "[p]rices are rising - even faster than expected.  Transaction prices on U.S. kraft linerboard and corrugating medium rose $40/ton in January - fully reflecting the price hike.  Spot prices have reportedly risen further."[34]

97.     On February 21, 2006, Deutsche Bank reported that containerboard inventories "remain at historically lean levels" and characterized containerboard prices as "rapidly rising."[35] Deutsche Bank also noted that: "A $50/ton price hike has been announced for late March/early April.  A $40/ton January increase on linerboard & corrugated medium appears to have taken hold with relative ease.  A $30/ton October hike also went in with ease."[36]  On March 4, 2006, Official Board Markets noted:

> "Other integrateds that have announced recently (all up $50 per ton) include Weyerhaeuser (April 1), Norampac (March 20), and Packaging Corp. of America (March 21)…¶…Last month, Georgia-Pacific announced a $50 per ton increase is scheduled to take effect April 1…¶…If this latest increase is fully implemented it will mean that containerboard prices have risen 33 percent since mid-October.

98.     On March 6, 2006, International Paper filed its Form 10-K for year ending December 31, 2005.  In its Executive Summary discussing the outlook for 2006, it was noted that

---

[34] *060213 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[35] *060221 Deutsche Bank - January Containerboard*, Deutsche Bank – Equity Research
[36] *Id.*

"…operating rates should improve in 2006 reflecting announced industry capacity reductions in uncoated papers and containerboard."[37]

99.     On March 14, 2006, the FBA's Executive Committee met.  Approximately three weeks later, in early April 2006, Defendants and their co-conspirators raised prices on linerboard again, this time by nearly 10% ($50/ton) from $520/ton to $570/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 10% ($50/ton) from $490/ton to $540/ton.  These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time.

100.     In sum, between October 2005 and April 2006, the Defendants and their co-conspirators raised prices in concert three times, October 2005, January 2006, and April 2006.  By April 2006, the price of linerboard had reached prices of $560-570/ton – its highest level since 1995.  A trade journal reported, "[s]ince October 2005, board prices have risen 33%.  The quickness of the jump is unprecedented."[38]

101.     The price increases in containerboard and its components caused corrugated container prices to rise as well.  As reported by Deutsche Bank: "It appears that most of the first two containerboard price hikes have made their way into box prices.  Producers are now trying to push this spring's $50/ton hike downstream to boxes.  There are encouraging early signs in the corrugated sheet & local box markets."[39]

102.     Defendants' costs, however, did not increase during this period.  In discussing the increasing profit margins enjoyed by the industry in the first quarter of 2006, Deutsche Bank noted "[h]igher prices and a moderation of cost pressures were the key drivers."[40]  Thus, increased costs cannot explain the price increases.  Notably, in April 2006, containerboard prices reached their highest peak since 1995 – which was also during a period of known collusion. See *In re Linerboard Antitrust Litigation.*

---

[37] International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p. 11.
[38] Paperboard and Packaging (April 2006) at p. 16.
[39] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research
[40] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research

103.     In its May 9, 2006 10-Q, International Paper reiterated its bullish outlook for demand, noting that "[e]ntering the 2nd quarter, we expect operating profits to be somewhat higher than in the 1st quarter. Product demand and projects sales volumes are solid across all of our key platform businesses."

104.     Strong demand throughout 2006, combined with the capacity cuts and output restrictions imposed by the Defendants and their co-conspirators, resulted in significantly higher prices for Containerboard Products as stated in Weyerhaeuser's 2006 2nd Quarter 10-Q: "The increasing price realizations for containerboard and corrugated packaging resulted from an increase in industry demand for corrugated packaging, coupled with high containerboard mill operating rates and low inventory levels." Despite an increase in demand which began at least in 2005, in early 2006, Weyerhaeuser closed its 350,000 ton-per-year containerboard machine at its Plymouth, N.C., mill.

105.     On June 8, 2006, Deutsche Bank reported on the effect of recent tightening of supply by Defendants:

> Most containerboard companies reported q/q [quarter over quarter] margin gains in Q1 2006. Higher prices and a moderation of cost pressures were the key drivers…Published estimates for linerboard price have risen $120/ton since September, reaching $515/ton - - - the highest level since October 1995…Supply discipline has been an essential part of the equation. Since early 2005, 1.67MM tons of capacity have been closed.[41]

106.     On June 15, 2006, Deutsche Bank confirmed the price increases resulted in higher corrugated container prices to the Plaintiff Class: "The strong box volume and lower inventories in May enhance the odds that producers will get full pass through of the CB hike into boxes… [t]he May figures show very solid demand and an inventory level reviving from upward climb."[42]

107.     On July 18, 2006, Deutsche Bank reported that "[PCA] says that April hike is now essentially fully into boxes."[43]

---

[41] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research
[42] *060615 Deutsche Bank Report - May Containerboard & Box Numbers Big Volumes*, Deutsche Bank – Equity Research
[43] *060718 Deutsche Bank Report - COMPANY ALERT - Packaging Corp. of America*, Deutsche Bank – Equity Research

108. On July 25, 2006, Deutsche Bank reported that Weyerhaeuser's "box prices were up 5.3%."[44]

109. On August 7, 2006, Deutsche Bank reported that "[c]ompany earnings announcements to date show the 3rd price hike is being passed in the form of higher box prices."[45]

110. Despite the substantially increased prices already brought about by a constriction of capacity and supply, in the 3rd Quarter of 2006, Norampac closed its 300,000 tons-per-year Ontario, Canada plant. On August 31, 2006, the *Toronto Sun* reported the closure, noting that Norampac cited "unfavourable economic factors" as the reason for the closure.[46] The Ontario plant was 20% of Norampac's total containerboard capacity and nearly 1% of total North American containerboard capacity. Norampac blamed the closure on high energy and input costs. However, as recently as June 2006, the trade press had indicated that Containerboard Products producers' margins were increasing due in part to a moderation of costs. In response to the plant closing, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement. Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%."[47] This plant shutdown was not in Norampac's unilateral economic self-interest as it came at a time of rising containerboard prices, tight supply and high plant operating rates.

111. On October 9, 2006, Deutsche Bank reported that containerboard "[d]emand remains solid."[48]

112. On October 18, 2006, Deutsche Bank reported that PCA had record earnings per share in the 3rd Quarter of 2006, which reflected the hikes in containerboard prices. Deutsche Bank also reported that PCA was "trimming output @ pt when mkt appears to be easing. [sic] They're not 'free riding' & not delaying – encouraging signs…4Q impact of mill outages will remove 12K tons from system…production cut-backs by a player often viewed as industry 'free

[44] *060725 Deutsche Bank Report - COMPANY ALERT – Weyerhaeuser*, Deutsche Bank – Equity Research
[45] *060807 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[46] *N. Ontario Mill To Shut Down,* THE TORONTO SUN, p. 54.
[47] *060830 Deutsche Bank Report - Norampac closing Red Rock*, Deutsche Bank – Equity Research
[48] *061009 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank - Equity Research

rider' are constructive."[49]  PCA was contributing to the cartel by taking downtime and reducing containerboard output while demand remained strong.  Under competitive market conditions, PCA's downtime would not have been in its unilateral interest; rather, it would have continued as a free rider on the output reductions of the other Defendants.  PCA's downtime under then-current market conditions and expectations made economic sense only pursuant to an agreement or understanding with its competitors that they would also restrict supply.

113.    This was confirmed by PCA's 10-K for the year ending December 31, 2006:

Industry supply and demand trends were favorable throughout 2006.  Industry shipments of corrugated products increased 1.3% during 2006 compared to 2005, on a per workday basis.  During this same period, industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2006 at its second lowest level in the past 25 years, on a weeks of supply basis.  Since September 2005, linerboard prices have increased $120 per ton, or approximately 30%, as reported by industry publications.

114.    Just one week after reporting that PCA was taking downtime to further reduce any slack in the supply constraint, on October 25, 2006, Deutsche Bank reported that: "Best news may be SSCC's [Smurfit-Stone] Q4 'maintenance' downtime.  With markets appearing to slow, throttling back on supply could help pricing environment."[50]

115.    In October 2006, Weyerhaeuser and International Paper announced a price increase effective on January 1, 2007.

116.    The unprecedented across-the-board increases in containerboard prices were due to a concerted effort by the Defendants and their co-conspirators to restrict output and capacity. Industry trade journals reported that the "linerboard market began to tighten in the fourth quarter of 2005 and containerboard dropped to an unusually low level of 2.2 million tons."[51]  Another trade journal noted that "capacity reductions…may be the most important overall factor behind the strong price gains" and that "[w]ith supplies short, mills were in the drivers' seat and began to aggressively push up prices."[52]

---

[49] *061018 Deutsche Bank Report - PKG in 100 Words No more 100% operating rates?* Deutsche Bank - Equity Research
[50] *061025 Deutsche Bank Report - SSCC Q3 in 100 Words*, Deutsche Bank - Equity Research
[51] Pulp & Paper (Jan. 2007) at p. 15.
[52] Paper Age (September/October 2006) at p. 15.

117.    All together, between 1st Quarter 2005 and 3rd Quarter 2006, Defendants and their co-conspirators shut down nearly 1.7 million tons worth of containerboard capacity. In comparison, the conspiracy among a similar set of defendants in 1993-1995 was executed by shutting down only 300,000-350,000 tons of capacity. See *In re Linerboard Antitrust Litigation*, 305 F.3d at p. 154. These massive shutdowns were part of the Defendants and their co-conspirators' concerted effort to stabilize and raise the price of Containerboard Products.

**2007**

118.    In 2007, Defendants and their co-conspirators continued to shut down capacity in furtherance of their conspiracy. In late January 2007, International Paper took 74,000 tons of containerboard capacity offline. In April, PCA reported that it took unspecific downtime in the 1st and 2nd Quarters of 2007.

119.    On April 18, 2007, PCA Chairman and CEO, Paul Stecko, stated the following with respect to industry-wide inventories during the PCA's 1st Quarter earnings conference call:

> Our containerboard inventories at the end of the first quarter were down about 2000 tons compared the year-end 2006 levels. I should also note that yesterday the Fibre Box Association released industry statistics for the month of March and in our opinion these statistics are very encouraging. Corrugated products demand was up 3.4% per workday and containerboard inventories fell by 75,000 tons to 2.472 million tons or 4.1 weeks of supply. This is 200,000 tons lower than the average March containerboard inventory for the past ten years and on a weeks of supply basis, this is the lowest March ending inventory on record. So pretty healthy statistics.

120.    In June 2007, Smurfit-Stone closed down two plants, a 148,000 tons-per-year plant in Vernon, California and a 52,000 tons-per-year plant in Carthage, Indiana.

121.    On June 18-20, 2007, there was a Joint AF&PA, AICC and FBA Washington Fly-In meeting in Washington, DC. Shortly thereafter, Weyerhaeuser announced a $40/ton price hike, effective August 1, 2007.

122.    In early July 2007, PCA and Smurfit-Stone also announced a $40/ton containerboard price hike, also effective August 1, 2007.

123.    Regarding whether these announced price hikes would work, Deutsche Bank commented that "the global containerboard backdrop remains just about as favorable as any we

have seen in over 20yrs."[53]  On July 6, 2007, Deutsche Bank reported that "[v]irtually all major containerboard producers have slated $40-50/ton hikes for August."[54]

124.    On or about August 1, 2007, Defendants and their co-conspirators raised prices on containerboard again, this time by over 7% ($40/ton) from $570/ton to $610/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 7% ($40/ton) from $540/ton to $580/ton.  These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

125.    On September 4, 2007, Deutsche Bank reported that the "full $40/ton price hike initiative for August was reflected in the trade papers and most of our trade reports suggest uncharacteristic discipline from the big integrateds."[55]

126.    On September 6, 2007, Norampac announced that it had entered into a joint venture with two other Containerboard Products manufacturers, including Smurfit-Stone, to establish a new company called Niagara Sheet LLC.  Commenting on the transaction, Marc-André Dépin, President and CEO of Norampac, noted "[t]he participation of Norampac in this joint venture follows the trend of our investment strategy which aims to consolidate our expansion in the United States and enable us to ensure the quality of our products and the satisfaction of our customers."

127.    October 2007, International Paper closed down its 200,000 tons-per-year containerboard plaint in Terra Haute, Indiana.

## 2008-2009

128.    On February 1, 2008, Deutsche Bank reported that "plant inventories fell from 3.1 to 3.0 weeks, one of the lowest levels in history."[56]

129.    On or about March 17, 2008, International Paper announced that it was purchasing Weyerhaeuser.  This merger would make International Paper the single largest

---

[53] *070703 Deutsche Bank Report - August Containerboard Price Hike*, Deutsche Bank - Equity Research
[54] 070706 *Deutsche Bank Report - Dr. Paper's Weekly Wrap Up (7/6/07)*, Deutsche Bank - Equity Research
[55] *070904 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank - Equity Research
[56] *080201 Deutsche Bank Report - January Containerboard Monitor,* Deutsche Bank - Equity Research

containerboard producer with 11.5 million tons per year of global containerboard capacity. As indicated above, prior to the merger announcement, International Paper had been idling and reducing its capacity.

130.    On March 24-26, 2008, the FBA's Annual Meeting 2008, was held at the J.W. Marriot Desert Springs in Palm Desert, California. At this Annual Meeting, the FBA's Board of Directors meeting was also held.

131.    On March 30-April 2, 2008, the American Forest & Paper Association held its Annual Paper Week convention in New York, New York.

132.    On or about May 5, 2008, International Paper's purchase of Weyerhaeuser was approved. As a result of the merger, the top 7 containerboard producers made up a combined market share of approximately 80%.

133.    On May 16, 2008, Deutsche Bank reported that containerboard inventory was the "second-lowest April level in 20 years."[57]

134.    On May 28, 2008, Deutsche Bank reported that both Smurfit-Stone and Georgia Pacific recently announced a $50/ton price hike, effective July 1, 2008.[58]

135.    On or about July 1, 2008, despite the effects of an economic recession felt throughout the United States, Defendants and their co-conspirators raised prices on linerboard yet again, this time by over 9% ($55/ton) from $610/ton to $665/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($40/ton) from $580/ton to $635/ton. The Defendants quickly followed the price increases in containerboard and corrugated medium by announcing an 11% increase in the price of finished boxes.[59] These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

---

[57] *080516 Deutsche Bank Report - April Containerboard Monitor*, Deutsche Bank - Equity Research
[58] *080528 Deutsche Bank Report - July Price Hike*, Deutsche Bank - Equity Research
[59] P. Scott Vallely. *Update on Containerboard Grades: Notes from Deutsche Bank Research Paper*. (June 17, 2008
) http://psvalley.blogspot.com/2008/06/update-on-containerboard-grades.html

136.    In October 2008, Smurfit-Stone shut down its 135,000 tons-per-year corrugated medium plant, in Snowflake, Arizona.  That same month, International Paper began idling its 250,000 tons-per-year containerboard plant in Albany, Oregon.  Less than a month later, in November 20008, International Paper shut down its 430,000 tons-per-year linerboard plant in Valiant, Oklahoma.

137.    Between fourth quarter of 2008 and first quarter of 2009, over 800,000 tons per year of capacity was idled by Defendants Smurfit-Stone and Georgia Pacific.  In fourth quarter of 2008, Smurfit-Stone idled plants in Matane, Quebec (174,000 tpy), Missoula, Montana (171,000 tpy), and Jacksonville, Florida (170,000 tpy).  Likewise, Georgia Pacific idled plants in Cedar Springs, Georgia (265,000 tpy) and Palatka, Florida (40,000 tpy).

138.    In 2009, John Geenan, a senior vice-president of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), explained that the containerboard industry aggressively managed capacity in order to maintain or increase pricing and that whenever prices threaten to decrease the industry rapidly removed capacity.

139.    On December 14, 2009, Smurfit-Stone announced the permanent closure of its Containerboard Products mills in Missoula, Montana (which produced 620,000 tons of linerboard annually) and Ontonagon, Michigan (which produced 280,000 tons of medium annually) effective December 31, 2009.  In response to the Missoula mill closure, Montana state senator Cliff Larson sent a letter to Judge Brendan L. Shannon, presiding Judge in Smurfit-Stone's Chapter 11 Bankruptcy proceedings, stating:

> "We are told that Smurfit-Stone does not want the plant to run because they want to control 'the market.'  Well, what about competition?  What about gathering in cash for investors and creditors?  With electric generating capacity of about seventeen megawatts setting idle, trained plant workers willing to work and generate that biomass energy source we have a ready source of green energy sadly not generated. Another income source - not actualized."

### 2010

140.    Effective on or about January 1, 2010, Defendants and their co-conspirators again raised prices on linerboard by over 8% ($50/ton) from $585/ton to $635/ton.  At the same time,

Defendants and their co-conspirators raised the price of corrugated medium by over 8% ($50/ton) from $555/ton to $605/ton. This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.

141. Just three months later, effective on or about April 1, 2010, Defendants and their co-conspirators again raised prices on linerboard by over 9% ($60/ton) from $635/ton to $695/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($60/ton) from $605/ton to $665/ton. This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.

142. On June 30, 2010, Defendant International Paper informed its customers of another $60/ton price effective August 1, 2010. Announcements from other Defendants soon followed.

143. On July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "*3rd Containerboard Increase puts the Integrity of Our Industry on the Line*." In light of the significant manufacturing capacity cuts, as well as the absence of cost drivers, the article recognizes that a third price increase in 2010 in that environment "calls into question the integrity of our industry." The article goes on to forewarn of serious repercussions:

> This third increase is rightfully calling into question the pricing activities of the major companies. During the years 1994-1995, six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak of $525-535/ton. These actions rightfully caused corrugated users to seek alternative packaging and reduce their corrugated purchases – witness the growth of returnable plastic container use in the mid-1990s. A far more serious result was an inventory collusion allegation and subsequent class action lawsuit brought by the corrugated industry's customer base that cost containerboard makers over $210 million in settlements.

144. The Defendants and their co-conspirators raised the price of containerboard in order to cause an increase in the price of corrugated containers. Because Defendants convert 81% of the containerboard they manufacture into corrugated containers, Defendants reduced

containerboard capacity and jointly increased containerboard prices in order to artificially drive up the price of corrugated containers and increase their profits.

145.   To accomplish the unprecedented price increases during the Class Period, the Defendants and their co-conspirators needed to reduce capacity in a concerted fashion.   No single Defendant could reduce capacity enough to cause an industry-wide price increase. Accordingly, the Defendants reduced capacity in concert to prevent any one Defendant from bearing the brunt of the capacity shutdown.   Defendants' coordinated efforts to restrict containerboard supply substantially reduced the inventory available for sale to Plaintiff Class[60]:





146.   Further, the price of both linerboard and corrugated medium rose at exactly the same time by exactly the same per-ton amounts.   This identical and simultaneous across-the-board price increase on multiple products can only be explained by concerted and coordinated behavior by the Defendants.

### There Are No Innocent Explanations for the Coordinated Price Increases

147.   Despite the unprecedented price increases implemented in the Containerboard Products industry during the Class Period, there were no sustained significant changes in production costs which could account for those price increases or Defendants' coordinated

---

[60] M. Wilde, Deutche Bank, *Containerboard Market Overview*, Apr. 15, 2010, at p. 5.

reduction in manufacturing capacity and product supply. During the Class Period, prices increased at over double the rate of corresponding manufacturing costs.

148.     There are four main costs which are responsible for the bulk of the total cost to manufacture and produce Containerboard Products. They are 1) raw material costs; 2) labor costs; 3) energy costs; and 4) environmental compliance costs. As explained below, there were no significant or sustained changes in any of these types of costs during the Class Period.

149.     <u>Raw Material Costs</u>: Pulpwood (woodchips used to produce various paper products) is the main input for linerboard. Consequently, it is by far the most significant portion of linerboard cost, representing approximately 40-50%. Alternately, other factors including energy and labor cumulatively represent only about 25%. Because pulpwood prices represent such a large portion of linerboard cost, significant changes in the former may be detected in changes in the latter. The price of pulpwood has increased at a constant rate since the middle of 2001 (an average of roughly 6% per year). As a result, there are no major fluctuations in pulpwood price that correspond to the fluctuations in Containerboard Products.

150.     <u>Labor costs</u>: According to PCA's executives: "[l]abor costs in a well run containerboard mill run $30-$40/ton cash cost, which is a relatively small part of the overall manufacturing cost…"[61] Average weekly earnings for production workers at paperboard mills has remained flat during the Class Period. Additionally, the 2005 annual report for Smurfit-Stone stated that both post-retirement healthcare and life insurance benefits were reduced in 2005. Therefore, labor costs can largely be dismissed as an explanation for Containerboard Products price increases.

151.     <u>Energy Costs</u>: Studies by economists have found no significant effect of energy costs on containerboard prices.[62] Additionally, International Paper, the largest producer of containerboard, stated in its 2005 10-K that, "[w]hile energy, wood and raw material price movements are mixed, their impact for the quarter is expected to be flat." In reference to the first few months of 2006, it was further added, "[w]e are starting to see some reductions in natural gas

---

[61] Paul Stecko. *Creating Shareholder Value in Containerboard Markets*. PULP & PAPER 63 (March 1, 2005).
[62] *See e.g.* Li, H. and Luo, J. Industry Consolidation and Price in the US Linerboard Industry. Journal of Forest Economics 14 (2008), pp. 93-115.

and southern wood costs that, if the trend continues, should benefit operations as the year progresses."[63]  Despite some volatility in the natural gas mark since that time, natural gas prices in 2010 are at or below the natural gas prices existing at the beginning of the Class Period.

152.  Despite the absence of any lasting cost increases, Defendants have nevertheless attempted to blame increasing costs as the reason for their capacity restrictions and increases in Containerboard Products prices.  Specifically, in the third quarter of 2006, the President and CEO of Norampac attempted to the explain the closure of Norampac's 300,000 tons-per-year Ontario mill as follows: "[t]his decision was taken to mitigate the negative impacts of several economic factors such as growing fiber supply costs, rising energy costs and the strengthening of the Canadian dollar."[64]  However, as this explanation does not comport with the relevant market data, it serves as little more than a pretense for collusive activity.  See *In re Linerboard Antitrust Litigation*, 504 F.Supp.2d 38, 53 (E.D.Pa. 2007) ("[t]he Third Circuit has long recognized that evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action' by an alleged conspirator. [Citations].")

153.  In response to Norampac's announcement, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement.  Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%."[65]

154.  There is no consistent observable relationship between the price of natural gas (the predominant source of energy for the containerboard industry) and the price of containerboard. For example, although there was a brief uptick in the price of natural gas in the 4th Quarter 2005, the increased containerboard price during the same period outpaced any corresponding manufacturing cost increase.  Moreover, the price of natural gas fell nearly 40% from December 2005 to April 2006 without any corresponding price decrease in Containerboard Products.  In fact, in April 2006, well after the 40% drop in natural gas prices, Defendants and their co-conspirators again raised the price of containerboard over 10%.  If energy costs were

---

[63] International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p.11.
[64] http://timview.blogspot.com/2006/09/red-rock-mill-shut.html
[65] *060830 Deutsche Bank Report - Norampac closing Red Rock*, Deutsche Bank – Equity Research

responsible for price changes (as explained by Defendants to their customers) a 40% decrease in energy costs should result in a lower containerboard price, not a 10% increase. Similarly, from April 2006 through June 2007, the price of natural gas declined by approximately 7%. However, in August 2007, the Defendants and their co-conspirators raised containerboard prices by 7%. These increases in containerboard price cannot be explained by changes in energy costs.

155. Deutsche Bank reported that PCA reduced its natural gas usage "to barely over 3% of purchased fuels (was 9% year ago)."[66] On April 18, 2006, Deutsche Bank doubted the ability of the Defendants and their co-conspirators to push further price increases through noting that "raw material costs for natural gas & wastepaper have fallen."[67] This is further indication that neither natural gas costs nor raw material costs had a significant impact on costs associated with producing Containerboard Products.

156. Environmental Costs: The Defendants' public filings report that "Compliance with environmental standards should not adversely effect our competitive position or operating results."[68] Accordingly, compliance with environmental regulations cannot explain the extraordinary increase in price of containerboard during the Class Period.

157. The elimination of cost explanations supports an inference of conspiracy. Both the capacity reductions and the price increases of the period beginning summer 2005 were record breaking in magnitude. In early 2006, one trade journal reported, "Since October 2005, board prices have risen 33%. The quickness of the jump is unprecedented."[69] In regards to capacity reductions during this period, another trade journal called them "unprecedented." By the end of 2006, the Defendants had successfully driven inventory to their lowest levels in twenty five years. In addition, demand for Containerboard Products is tied to overall consumer demand and spending. In 2008, general consumer demand in the United States plummeted. Yet, in August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%. Even though the U.S. economy has continued to be weak with fears of deflation being expressed by

---

[66] *060124 Deutsche Bank - Packaging Corp's 4Q in 100 words*, Deutsche Bank – Equity Research
[67] *060418 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[68] See e.g. Smurfit-Stone Form 10-K, filed March 06, 2006 at p. 7.
[69] Paperboard and Packaging. (April 2006) at 16.

economists and policymakers in 2009-2010, during 2010 Defendants and their co-conspirators raised Containerboard Product prices an unprecedented three times in one year to all time highs. Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.

158. The unprecedented reduction in North American containerboard supply was not the result of the closure of one producer's machines but rather concerted effort by the Defendants and their co-conspirators to reduce capacity in an effort to raise and stabilize prices of Containerboard Products to supra-competitive levels.

## ACTIVE CONCEALMENT

159. Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively, actively and fraudulently concealed their unlawful conduct from Plaintiff and the Plaintiff Class. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases, including that energy and raw material cost increases were responsible for the price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced.

160. As a result of the concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## ANTITRUST IMPACT AND DAMAGES

161. The unlawful conspiracy has had at least the following effects:

    a. Prices charged by Defendants and their co-conspirators to Plaintiff and the members of the Class for Containerboard Products were artificially fixed, raised,

stabilized and maintained at artificially inflated and supra-competitive levels in the United States;

b.   Plaintiff and the other members of the Class had to pay more for Containerboard Products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

c.   Competition in the sale of Containerboard Products was restrained, suppressed and eliminated in the United States; and

d.   As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured in their respective businesses and property, in amounts according to proof at trial.

## CLAIM FOR RELIEF

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

162.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

163.   Beginning at a time presently unknown to Plaintiff, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, combination and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Containerboard Products in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

164.   The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, and/or stabilized prices for Containerboard Products in the United States.   Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

165.   The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce.   The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between

and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

166. The contract, combination or conspiracy has had the following effects, among others:

    a. Prices charged to Plaintiff and Class members for Containerboard Products were fixed or stabilized at higher, artificially derived, supra-competitive levels;

    b. Plaintiff and Class members have been deprived of the benefits of free, open and unrestricted competition in the market for Containerboard Products; and

    c. Competition in establishing the prices paid, customers of, and territories for Containerboard Products has been unlawfully restrained, suppressed and eliminated.

167. As a proximate result of the Defendants' unlawful conduct, Plaintiff and Class members have suffered injury in that they have paid supra-competitive prices for Containerboard Products. Plaintiff and Class members will continue to be injured in their business and property by paying more for Containerboard Products purchased directly from the Defendants and their co-conspirators than they would pay in the absence of the contract, combination or conspiracy.

## **PRAYER**

WHEREFORE, Plaintiff prays as follows:

A. That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B. That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

C. That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

D.　　That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.　　That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws; and,

E.　　That Plaintiff and members of the Class have such other, further or different relief, as the case may require and the Court may deem just and proper under the circumstances.

## **JURY TRIAL DEMAND**

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated:　　September 16, 2010

/s/ Michael J. Freed

Michael J. Freed
Steven A. Kanner
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015 USA
T: 224-632-4500
F: 224-632-4521
mfreed@fklmlaw.com
skanner@fklmlaw.com
mmoskovitz@fklmlaw.com

Daniel J. Mogin
Matthew T. Sinnott
Kristy L. Fischer (Of Counsel)
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
T: 619-687-6611
F: 619-687-6610
Dmogin@moginlaw.com

W. Joseph Bruckner
Heidi M. Silton
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com

***COUNSEL FOR PLAINTIFF EL JAY POULTRY CORPORATION***